# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEAN M. CAREY, ) | |
| ) | |
| Plaintiff ) | |
| ) | Civil Action No. 10-889 |
| v. ) | |
| ) | Judge Donetta W. Ambrose |
| COMMISIONER OF ) | |
| SOCIAL SECURITY, ) | Electronic Filing |
| ) | |
| Defendant ) | |

## MEMORANDUM OPINION

### I.   INTRODUCTION

Jean M. Carey ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking
review of the final determination of the Commissioner of Social Security ("Defendant" or
"Commissioner") denying her application for supplemental security income ("SSI") under Title
XVI of the Social Security Act, 42 U.S.C. § 1381 – 1383f ("Act"). This matter comes before the
court on cross motions for summary judgment. (ECF Nos. 10, 15). The record has been
developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary
Judgment is GRANTED, in part, and DENIED, in part, and Defendant's Motion for Summary
Judgment is DENIED.

## II. PROCEDURAL HISTORY

Plaintiff filed for SSI with the Social Security Administration October 25, 2006, claiming an inability to work due to disability beginning April 1, 1997. (R. at 111)[1]. Plaintiff was initially denied benefits on April 12, 2007. (R. at 77 – 81). A hearing was scheduled for June 3, 2008, and Plaintiff appeared to testify represented by counsel. (R. at 30). A vocational expert, Tim Mahler, also testified. (R. at 30). The Administrative Law Judge ("ALJ") issued her decision denying benefits to Plaintiff on September 30, 2008. (R. at 16 – 28). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on May 6, 2010, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 3).

Plaintiff filed her Complaint in this court on July 6, 2010. Defendant filed his Answer on October 12, 2010. Cross motions for summary judgment followed.

## III. STATEMENT OF THE CASE

### A. General Background

Plaintiff was born on May 11, 1963, and was forty five years of age at the time of her administrative hearing. (R. at 33, 111). Plaintiff completed high school, but has no post-secondary education. (R. at 33). Plaintiff was unemployed, and had last held a job approximately ten years prior to the hearing as a cook. (R. at 33). When Plaintiff was forty years of age, she was sentenced to twenty-four months in federal prison for bank fraud/ identity theft. (R. at 250, 255). Plaintiff is now on public assistance, receives food stamps, and has an access card for medical care. (R. at 35 – 36). Plaintiff has four children, and is divorced. (R. at 34). At the time of the hearing, Plaintiff resided in an apartment with one of her adult sons. (R. at 34).

---

[1] Citations to ECF Nos. 6 – 6-8, the Record, *hereinafter,* "R. at ___."

2

## B. Mental Health Treatment History[2]

Plaintiff's record of mental health treatment begins with her prison intake in September of 2003. At that time, Plaintiff was found to appear depressed and nervous. (R. at 321 – 22). It was noted that Plaintiff abused alcohol and crack cocaine for ten years prior to her incarceration. (R. at 217 – 28, 250 – 51, 255 – 56, 321 – 22). Plaintiff was not suicidal at that time. (R. at 217 – 18). However, it was noted that in May of 2003, Plaintiff had been hospitalized for claimed suicidal ideation following the death of her brother. (R. at 250 – 51). Plaintiff explained that she had not actually been suicidal, but had lied to gain admission to the hospital. (R. at 250 – 51). Plaintiff further reported that she had been in and out of mental health treatment for approximately seventeen years. (R. at 250 – 51). She had been abusing drugs and alcohol daily until the date of her intake into federal prison. (R. at 250 – 51, 255 – 56).

The intake evaluator noted that Plaintiff appeared mildly depressed and mildly irritated, and also exhibited a jaded, guarded demeanor. (R. at 250 – 51, 347). Otherwise, Plaintiff was cooperative, alert, exhibited fair hygiene, proved to be a reliable personal historian, was euthymic, showed a full range of affect, and had normal speech and linear thought processes. (R. at 255 – 56). There was no indication of psychosis, suicidal ideation, or homicidal ideation. (R. at 250 – 51, 255 – 56). However, Plaintiff did have limited insight and judgment. (R. at 255 – 56). Plaintiff was diagnosed with major depression, substance abuse issues, and antisocial personality disorder. (R. at 255 – 56). She was assessed a global assessment of functioning[3] ("GAF") score of 45. (R. at 255 – 56).

---

[2]     Plaintiff makes no argument respecting the ALJ's disability determination as it relates to Plaintiff's physical impairments and limitations; therefore, the court's statement of the case and discussion will focus primarily upon Plaintiff's mental impairments and limitations.

[3]     The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score

3

Throughout the remainder of her stay in federal prison, Plaintiff's mental state was relatively unchanged. On December 18, 2003, Plaintiff's GAF score increased to forty nine. (R. at 207). It was often noted that Plaintiff's mood was variable and depressed. (R. at 200). Bipolar disorder and mood disorder were also included among her mental health issues. (R. at 275, 293). However, the status quo typically included, along with Plaintiff's diagnoses, euthymic mood, full range of affect, no delusions, no hallucinations, no suicidal ideation, and no homicidal ideation. (R. at 183). Plaintiff was following her medication regimen, and no medication side effects were reported. (R. at 183). By June 7, 2005, Plaintiff's mood had elevated and her activity had increased. (R. at 275).

Near the end of her time in prison, in June of 2005, Plaintiff had a brief stint under suicide watch after she reported that she was suicidal. (R. at 274). Plaintiff later informed her therapists that she had not truly been suicidal. Rather, Plaintiff was upset over the actions of a roommate who had placed an unauthorized item amongst her personal affects in order to get Plaintiff into trouble. (R. at 228, 272, 274, 324, 326, 329, 338). Plaintiff explained that her time in seclusion during the suicide watch allowed her to calm down. (R. at 228, 272, 274, 324, 326, 329, 338).

The last mental health report from the prison was dated July 1, 2005. (R. at 179). It indicated that she was doing well with her medications and was suffering no side effects. (R. at

considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

4

179). Plaintiff's health was stable, her mood was euthymic, she exhibited a full range of affect, she denied suicidal or homicidal ideation, and she experienced no delusions or hallucinations. (R. at 179).

In August of 2006, Plaintiff was admitted to the hospital because of alleged suicidal ideation and depression. (R. at 380). At intake, Plaintiff did not appear to be in acute distress, and she appeared well. (R. at 380). Plaintiff exhibited no evidence of psychosis. (R. at 355). A toxicology screening showed the presence of cannabinoids and cocaine in Plaintiff's bloodstream. (R. at 380). Plaintiff reported at intake that she had not used illicit drugs for several weeks prior to her admission. (R. at 354). Depression, suicidal ideation, and multidrug abuse were diagnosed. (R. at 380). A GAF score of 35 – 40 was assessed. (R. at 356).

In September of 2006, the record indicates that Plaintiff reported violent nightmares and voices in her head. (R. at 373). The following month, Plaintiff went to the hospital due to the voices in her head, and claimed she was suicidal. (R. at 367, 370). Plaintiff had been participating in a sobriety program at Cove Forge Rehabilitation, and claimed that she had been drug and alcohol free for thirty days. (R. at 367, 370). Plaintiff had apparently visited another hospital in July of 2006 for the same reason. (R. at 367). Plaintiff was noted to be drowsy, disheveled, had slightly blunted affect, and suffered from auditory hallucinations. (R. at 368). Yet, Plaintiff was also observed to have intact hygiene, euthymic mood, fluent speech, normal thought, and no delusions, and she denied suicidal or homicidal ideation. (R. at 368). Plaintiff was diagnosed as suffering from psychosis and suicidal ideation. (R. at 367). She received a GAF score of 30. (R. at 358, 368).

A progress note written by Plaintiff's treating psychiatrist, Anil Parekh, M.D. in April of 2008 opined that Plaintiff had recently been complaining of increased stress, depression, and

5

auditory hallucinations, following the incarceration of one of her sons, serious illness of another son, and a recent diagnosis that Plaintiff was potentially post-menopausal. (R. at 443). Plaintiff appeared to be alert, oriented, and cooperative. (R. at 443). Her speech was fluent, her eye contact was good, her hygiene and grooming were adequate, she denied suicidal or homicidal ideation, and she denied delusions. (R. at 443). Plaintiff exhibited no psychomotor retardation. (R. at 443). Plaintiff had no flight of ideas or looseness of associations. (R. at 443). Her mood was sad and anxious, however. (R. at 443). Plaintiff was diagnosed as suffering from schizoaffective disorder (depressed type), cocaine dependence in sustained full remission, and borderline personality disorder. (R. at 443).

On May 30, 2008, Nicole Smolen, M.A., Plaintiff's psychotherapist since April of 2007, evaluated Plaintiff's mental health status. (R. at 442). Ms. Smolen indicated that Plaintiff had been attending therapy consistently; however, Plaintiff had missed seventeen of the last fifty three appointments. (R. at 442). Plaintiff was found to suffer from schizophrenic disorder (bipolar type), and borderline personality disorder. (R. at 442). She was assessed a GAF score of 50. (R. at 442). Plaintiff reported to Ms. Smolen that she suffered cycles of mania and depression, and was plagued by auditory hallucinations. (R. at 442). Plaintiff also complained of anxiety in social situations. (R. at 442). Plaintiff claimed that she often had difficulty getting out of bed or leaving her home, and often had trouble performing daily functions such as going to the grocery store. (R. at 442).

*C. Functional Limitations*

On March 7, 2007, Charles Kennedy, Ph.D. conducted a psychological evaluation for purposes of determining eligibility for SSI. (R. at 379). Dr. Kennedy initially noted that Plaintiff had utilized mass transit to arrive at the appointment and was on-time. (R. at 379). Her

6

appearance and hygiene were adequate, she was cooperative and compliant, and was well-mannered. (R. at 379). Dr. Kennedy also observed that Plaintiff displayed adequate self-sufficiency. (R. at 379). Plaintiff's mental status examination went "fairly well," and she was able to offer adequate information about her personal history. (R. at 380).

At the time of the evaluation, Plaintiff reported that she had struggled with mental health issues her entire life. (R. at 379). She reported that she had recently completed a drug and alcohol program, and despite a crack-cocaine addiction spanning many years, had been clean for seven months prior to the evaluation. (R. at 379). Plaintiff explained that past drug use was intended to drown out voices that continuously spoke to her and were progressively worsening. (R. at 380). She indicated that she had experienced these voices for about ten years. (R. at 380). She described her resultant mood as variable, though typically depressed. (R. at 380). Plaintiff claimed that she had not been employed since before 1992. (R. at 380). At the time of the evaluation, Plaintiff was participating in individual and group therapy. (R. at 380).

Plaintiff maintained only fleeting eye contact, but showed no symptoms of anxiety, had normal psychomotor activity, performed adequately, sustained her attention through the entire evaluation, answered all questions, and had a positive attitude, normal speech, and appropriate emotional expression. (R. at 382). Plaintiff's stream of thought was goal-directed, there were no language impairments, and preoccupations, depersonalization, derealization, and hypochondriasis were all denied. (R. at 382). There was no evidence of delusional thinking, her abstract thinking was good, her intelligence was within normal limits, she was oriented, her memory was intact, her impulse control was adequate, her judgment was good, and she appeared to be fairly reliable. (R. at 382). Her insight was limited, however. (R. at 382). She reported

7

poor sleep, her interests had decreased, and her energy level was reportedly low. (R. at 382). Plaintiff denied suicidal ideation. (R. at 382).

Dr. Kennedy concluded that Plaintiff suffered from schizoaffective disorder and cocaine dependence in early partial remission. (R. at 383). A GAF score of 37 was recorded. (R. at 383). Plaintiff's prognosis was guarded, but she was found to be likely to improve with the support of mental health services. (R. at 383). Plaintiff exhibited marked limitation in interacting appropriately with the public, interacting appropriately with coworkers, responding appropriately to pressure in a usual work setting, and responding appropriately to changes in a routine work setting. (R. at 384). Plaintiff was otherwise only mildly to moderately restricted. (R. at 384).

Roger Glover, Ph.D., conducted a mental residual functional capacity ("RFC") assessment of Plaintiff on April 2, 2007. (R. at 387). Dr. Glover opined that Plaintiff suffered from schizoaffective disorder and cocaine dependence, in early remission. (R. at 388, 392, 398). Plaintiff was determined to have marked restriction in her ability to understand, remember, and carry out detailed instructions. (R. at 386 – 87). Plaintiff was otherwise only mildly to moderately restricted. (R. at 386 – 88, 400). Dr. Glover concluded that the earlier findings of Dr. Kennedy were an overestimate of Plaintiff's personal and social limitations. (R. at 388). However, Dr. Glover concurred with Dr. Kennedy's findings with respect to Plaintiff's occupational and performance limitations. (R. at 388). Dr. Glover found Plaintiff capable of full-time competitive employment. (R. at 388).

Finally, on July 3, 2008, Plaintiff's mental health nurse practitioner, Barbara Bourdess, C.R.N.P./ M.S.N., completed a "Medical Assessment of Ability to do Work-Related Activities –

8

Mental," form[4]. (R. at 445 – 48). It was noted that Plaintiff was easily agitated, narcissistic, confrontational, disregarded the needs of others, and was unable to commit herself to working regularly. (R. at 445 – 48). While Plaintiff was of average intellect, if her mood was poor, her performance would be poor. (R. at 445 – 48). Additionally, Plaintiff fatigued easily. (R. at 445 – 48). She was diagnosed with schizoaffective disorder (depressed type), and cocaine dependence. (R. at 445 – 48).

On a scale of functional ability – ordered as "unlimited/ very good," "good," "limited," and "none" – Plaintiff was found to be "limited[5]" with respect to following work rules, relating to coworkers, dealing with the public, using judgment, interacting with supervisors, dealing with work stresses, functioning independently, maintaining attention/ concentration, understanding remembering, and carrying out complex and/ or detailed job instructions, relating predictably in social situations, behaving in an emotionally stable manner, and demonstrating reliability. (R. at 445 – 48). Plaintiff was also considered incapable of managing benefits consistent with her own best interests. (R. at 445 – 48).

## D. *Administrative Hearing*

At her hearing, Plaintiff initially testified that she was unaware of the exact time that her disability began, but that several years prior to the hearing she began to hear voices, and began to experience symptoms of depression and bipolar disorder. (R. at 34). Plaintiff was hospitalized for psychological disorders on a number of occasions: twice in 2003, July of 2005, July of 2006, August of 2006, and October of 2006. (R. at 40 – 42). Plaintiff had drug and alcohol abuse

---

[4]     Plaintiff's treating psychiatrist, Dr. Parekh, also completed the same form on the same date. (R. at 445 – 48). However, Dr. Parekh's form was not submitted to the ALJ prior to her decision, and therefore, the court will not consider it when reviewing the ALJ's decision. (R. at 1 – 5).

[5]     In the context of the "Medical Assessment of Ability to do Work-Related Activities – Mental," form, "limited," refers to serious limitation in an area of functioning, but not complete preclusion. (R. at 445). The limited individual would not likely be able to maintain a daily schedule, or be able to stay on task for a full eight hour workday. (R. at 445).

9

issues, but claimed to have been abstinent since September 1, 2006. (R. at 42). She refused to complete the intake process for a psychiatric hospitalization in March of 2008. (R. at 69).

In terms of mental difficulties, Plaintiff explained that she constantly suffered auditory hallucinations in the form of voices that urged her to harm herself. (R. at 42, 44). When Plaintiff became nervous, the voices got louder. (R. at 42). Allegedly, there was little that Plaintiff could do to control the voices. (R. at 43). Techniques had been taught to Plaintiff in therapy to aid in control of the voices, and there had been improvement. (R. at 43). Plaintiff also suffered from frequent nightmares. (R. at 43). There was no discernible pattern in the occurrence of the nightmares or voices, and Plaintiff experienced fear, fatigue, and depression as a result. (R. at 43, 58). Plaintiff's bipolar disorder gave her manic episodes where she could not focus and was over-active, and depression episodes – lasting several days – during which Plaintiff did not even desire to leave her bed. (R. at 50, 57). Her neighbor often coaxed her to go outside to improve her mood. (R. at 50, 56). Plaintiff indicated that her bipolar disorder was her most significant limitation, and the reason she felt that she could not work. (R. at 57).

A number of medications were prescribed to Plaintiff to treat her varying disorders: Lamictal for mania, Seroquel for auditory hallucinations, Perphenazine for auditory hallucinations, Paroxetine for depression, Gabapentin for spine pain, and Alprazolam for anxiety. (R. at 37 – 39). Plaintiff complained of side effects including fatigue, shaking, headaches, and upset stomach. (R. at 39). The medications did not always provide relief, particularly for Plaintiff's psychological issues. (R. at 57).

Plaintiff was reapplying for a driver's license at the time of the hearing. (R. at 35). She had lost her license twelve years earlier due to a citation for driving under the influence, and had never attempted to regain it. (R. at 35). Plaintiff had also been attending psychiatric therapy

10

approximately once a week for the past year. (R. at 36 – 37). She claimed that she attended Alcoholics Anonymous and Narcotics Anonymous meetings once or twice a week. (R. at 59 – 60). The groups were composed of eight to nine people, and usually lasted approximately an hour. (R. at 59 – 60). Often, Plaintiff's sponsor picked her up to attend meetings. (R. at 59).

Plaintiff was capable of cleaning dishes, dusting, and occasionally vacuuming. (R. at 48, 52). Sometimes following her psychotherapy sessions, she was briefly able to do her own grocery shopping when her anxiety did not preclude it. (R. at 48). Generally, over the course of the year prior to her hearing, Plaintiff believed that her mental state had improved. (R. at 49). Plaintiff was able to care for herself, independently. (R. at 51). She was able to cook her own meals and clean her own laundry. (R. at 51 – 52).

A typical day for Plaintiff involved getting up around 9:00 a.m. (R. at 51). In the afternoon, Plaintiff watched soap operas from 2:00 until 3:00 p.m. (R. at 53). Plaintiff also watched movies, if she was able to focus. (R. at 53, 61). Plaintiff, per day, spent less than five hours watching television. (R. at 53). She did not spend any time on a computer. (R. at 53). She did spend approximately two hours every day reading novels. (R. at 54). She also enjoyed crocheting. (R. at 55). Plaintiff sometimes attended a local church approximately twice a month. (R. at 54). Normally, bedtime was around 11:30 p.m. (R. at 56).

Following Plaintiff's testimony, the ALJ asked the vocational expert what work would be available to a hypothetical person of Plaintiff's age, education, and work experience, if limited to sedentary positions requiring only occasional postural movements such as stooping, kneeling, crouching, crawling, and climbing (ladders, ropes, scaffolds, and stairs), routine repetitive tasks not performed in a fast paced production environment, involving only simple work related

11

decisions and few workplaces changes, and only occasional interaction with supervisors, coworkers, and the public. (R. at 63).

Mr. Mahler replied that jobs available to the hypothetical person would include: "waxers of glass products," with 66,000 positions available in the national economy; "addressers," with 100,000 positions available; "inspector/ checkers," with 37,000 positions available; and, "sorters," with 20,000 positions available. (R. at 64). With the same limitations, except that the hypothetical person would be capable of light work, the following jobs were available: "labelers and markers," with 64,000 positions available; "laundry folders," with 48,000 positions available; "hand packers," with 200,000 positions available; and, "inspector checkers," with 111,000 positions available. (R. at 64).

The ALJ then inquired as to whether any jobs would be available to the hypothetical person if he or she would miss more than one day of work per month, require more than half an hour break for lunch and two fifteen minute breaks a day, and was unable to stay on task at least eighty five to ninety percent of each workday. (R. at 65). Mr. Mahler explained that no jobs would be available to such a person. (R. at 65).

## IV.  STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[6] and 1383(c)(3)[7]. Section 405(g) permits a district court to review

---

[6]

Section 405(g) provides in pertinent part:
> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole. *See* 5 U.S.C. §706. When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support an ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala,* 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel,* 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.,* 332 U.S. 194, 196 – 97 (1947). In short, the court can only test the adequacy of an ALJ's decision based upon the rationale explicitly provided by the ALJ; the court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery,* 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable

---

[7]

Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

regulatory interpretations that an agency manifests in the course of making such findings."
*Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

To be eligible for social security benefits under the Act, a claimant must demonstrate that
he cannot engage in substantial gainful activity because of a medically determinable physical or
mental impairment which can be expected to result in death or which has lasted or can be
expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster
v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step sequential
analysis when evaluating whether a claimant has met the requirements for disability. 20 C.F.R.
§§ 404.1520, 416.920.

The ALJ must determine: (1) whether the claimant is currently engaged in substantial
gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of
impairments that is severe; (3) whether the medical evidence of the claimant's impairment or
combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P,
Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant
work; and (5) if the claimant is incapable of performing his past relevant work, whether he can
perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see
Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to
resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that,
given claimant's mental or physical limitations, age, education, and work experience, he or she is
able to perform substantial gainful activity in jobs available in the national economy. *Doak v.
Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

14

## V. DISCUSSION

In her decision, the ALJ found that as a result of Plaintiff's physical and mental impairments, she was incapable of maintaining substantial gainful employment on a full time basis. (R. at 19 – 28). Despite this finding, Plaintiff was determined not to be disabled for purposes of receiving SSI because her drug and alcohol abuse ("DAA") was material to this determination, and without the DAA, Plaintiff would be capable of maintaining substantial gainful employment on a full-time basis. (R. at 19 – 28).

Plaintiff's first two objections to the ALJ's decision focus upon the ALJ's alleged failure to accept and properly adhere to certain Social Security Administration regulations in finding that Plaintiff's DAA was material to her disability. (ECF No. 11 at 5 – 10). Specifically, Plaintiff avers that according to Social Security Administration emergency teletype EM-96200 (Questions and Answers Concerning DAA)[8], the ALJ was required to show that Plaintiff was ineligible for SSI because her disability resolved with sobriety. (*Id.*).

The Act states that "an individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." *Ambrosini v. Astrue*, 727 F. Supp.2d 414, 428 (W.D.Pa. 2010) (quoting 42 U.S.C. §§ 423(d)(2)(c), 1382c(a)(3)(J)). According to 20 C.F.R. §§ 404.1535 and 416.935, the 'key factor' in making the above conclusion is determining whether a claimant would continue to be disabled if they ceased to use drugs and/ or alcohol. Side effects of drug and alcohol abuse, and any impact on other existing impairments, must be isolated so that the remaining limitations may be assessed. EM-96200 at q. 25 – 28. It is the ALJ's responsibility to assess the impact of the remaining limitations on a claimant's ability to work,

---

[8]

Social Security Online, SSA's Program Operations Manual System Home, https://secure.ssa.gov/apps10/public/reference.nsf/links/04292003041931PM (last viewed February 17, 2011).

and if it is not possible to distinguish between the limitations created by DAA or the claimant's other impairments, to find that DAA is not a contributing factor material to disability. *Id.*

In his reply brief, the Commissioner explicitly accedes that EM-96200 is applicable to the present case, and that in assessing DAA, the ALJ must either project which limitations are attributable to a claimant's DAA, or find that DAA is not a contributing factor material to a disability determination. (ECF No. 16 at 15). The Commissioner goes on to say that despite following these requirements, the ALJ determined that Plaintiff's DAA was material. (ECF No. 16 at 15). Nevertheless, Plaintiff argues that the ALJ's decision should not be affirmed because it did not properly account for all credibly established limitations during Plaintiff's periods of sobriety, and did not discuss Plaintiff's GAF scores, undermining the ALJ's RFC assessment. (ECF No. 11 at 11 – 26).

In her decision, the ALJ listed degenerative disc disease of the lumbar spine, remote status post laminectomy and microdiscectomy, borderline personality disorder, schizoaffective disorder, depression, anxiety, and cocaine dependence in early partial remission as Plaintiff's severe impairments. (R. at 19). She further concluded that Plaintiff met listings 12.04 (Affective Disorders) and 12.09 (Substance Addiction Disorders), under 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, and was unable to engage in substantial gainful employment. (R. at 19). Plaintiff was not eligible for disability benefits, however, because the ALJ found that DAA was material to her determination that Plaintiff met listing 12.04 and 12.09. (R. at 19 – 20).

Without DAA, Plaintiff would be able to perform sedentary work, limited to no more than occasional postural maneuvers (such as stooping, kneeling, crouching, crawling, or climbing ladders, ropes, scaffolds, or stairs), no more than simple, routine, repetitive tasks not performed in a fast-paced production environment, no more than simple, work related decisions,

with relatively few workplace changes, and no more than occasional interaction with supervisors, coworkers, or members of the general public. (R. at 20). Even with such limitations, there were jobs existing in significant numbers in the national economy, and therefore, Plaintiff was not disabled. (R. at 20).

To the extent Plaintiff's argument that the ALJ erred relies upon an alleged failure to address Plaintiff's GAF scores over the course of treatment, the court finds the argument to be unavailing. The ALJ does make mention of Plaintiff's GAF scores. In fact, the ALJ remarks that the GAF scores gradually improved over the span of the record – the final score being 50 in May of 2008, and reflecting only moderate to serious limitation in functioning. (R. at 24).

With respect to formulating an RFC assessment based upon all of Plaintiff's credibly established limitations, however, the ALJ fell short of what is required. An RFC assessment "'is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Commissioner of Social Security,* 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel,* 181 F.3d 358, 359 n.1 (3d Cir. 1999)). In determining a claimant's RFC, an administrative law judge must consider all the evidence of record and the claimant's subjective complaints and statements concerning his limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a), and 416.920. Moreover, the hypothetical based upon the ALJ's RFC assessment and posed to the vocational expert "may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual . . . impairments." *Burns v. Barnhart,* 312 F.3d 113, 123 (3d Cir. 2002) (quoting *Podedworny v. Harris,* 745 F.2d 210, 218 (3d Cir. 1984)). To be considered substantial evidence, the vocational expert's testimony must have been based upon a hypothetical reflecting all medically undisputed evidence of impairment. *Allen v.*

17

*Barnhart*, 417 F.3d 396, 407 (3d Cir. 2005) (citing *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2004)). *See also Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d. Cir. 1987).

With respect to Dr. Kennedy's findings of marked limitations in Plaintiff's social functioning, the ALJ failed to discuss – with significant depth – this probative evidence tending to favor Plaintiff's position. (R. at 25). This was clearly in error. *Cotter*, 642 F.2d at 706 ("the court has recognized that there is a particularly acute need for some explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record"). Further, the ALJ similarly failed to discuss the findings of Plaintiff's nurse – with a treatment history spanning over one year – with any degree of depth. (R. at 25). This is problematic not only because the length of Ms. Bourdess' treatment history with Plaintiff is significant, but because the limitations findings were probative evidence weighing in Plaintiff's favor and were similar to many of the marked limitations findings made by Dr. Kennedy approximately one year earlier. (R. at 384, 445 - 48). Though Ms. Bourdess was neither a physician nor a psychologist, she was a treating mental health professional and her findings were probative evidence entitled to consideration, though not necessarily controlling weight. *Cook v. Commissioner of Social Security Administration*, 2010 WL 3885514 at *9 – 10 (W.D.Pa. 2010); 20 C.F.R. § 416.913(d)(1); *Yensick v. Barnhart*, 245 Fed. Appx. 176, 181 – 82 (3d Cir. 2007). *See also Dougherty v. Astrue*, 381 Fed. Appx. 154, 156 (3d Cir. 2010).

The ALJ also failed to adequately address certain relevant indicators of Plaintiff's non-DAA limitations as noted by Plaintiff's treating psychotherapist, Ms. Smolen. (R. at 25). The ALJ cryptically stated that Plaintiff's possible post-menopausal symptoms and medication adjustments may have been affecting and/ or exacerbating her pre-existing psychological limitations, accounting for Ms. Smolen's findings. (R. at 25). The ALJ failed to cite any medical

evidence to provide support for her implicit assertion that this diminished the probative value of Ms. Smolen's report of Plaintiff's limitations. (R. at 25).

The ALJ fails to persuasively explain how certain of Plaintiff's testimony regarding her functional limitations conflicted with evidence of her daily activities. To rebut Plaintiff's claim that she often had difficulty getting out of bed and maintaining daily functions, the ALJ noted Plaintiff's "good show rate," for her psychotherapy appointments. (R. at 25). The ALJ failed to mention, however, that Plaintiff's show rate was only thirty six out of fifty three scheduled appointments – meaning Plaintiff missed approximately thirty two percent of her appointments. (R. at 442). This does not appear to be inconsistent with Plaintiff's testimony regarding her difficulties during her depressed periods, and certainly is probative of Plaintiff's ability to meet the work attendance and productivity requirements as explained by the vocational expert at Plaintiff's administrative hearing. (R. at 65).

Similarly, the ALJ quickly disposed of Plaintiff's testimony that she may have as few as two good days a week, by citing to Plaintiff's attendance at Alcoholics Anonymous and Narcotics Anonymous meetings twice a week, and counseling sessions approximately once a week. (R. at 25). Even if Plaintiff attended every one of these sessions regularly – which her testimony clearly illustrated was not always the case – it is only evidence that Plaintiff is functionally capable of attending one hour-long meeting three times per week, not that her testimony was inconsistent with her activities of daily living. (R. at 59 – 60).

The ALJ bolsters her assertion that Plaintiff's averments of difficulty in social situations are inapposite to the record, by indicating that she regularly participated in group therapy, attended church, and went to the grocery store. (R. at 22 – 25). However, this assertion stops short of truly addressing the frequency – or infrequency – with which Plaintiff actually engaged

19

in these activities. Despite techniques gained in therapy for dealing with her social anxiety, Plaintiff testified – and Ms. Smolen affirmed – that Plaintiff had significant difficulty grocery shopping. (R. at 48, 442). Plaintiff testified that she was sometimes able to go immediately following a therapy session, but even then only briefly. (R. at 48). Plaintiff also attended church twice a month, at the very most. (R. at 54). This hardly illustrates an ability to engage in substantial gainful employment.

In a final note, it is worth pointing out that beginning in approximately September of 2006, and continuing through the end of the record, Plaintiff was sober. (R. at 367, 443). None of her treating medical sources stated otherwise. In fact, Plaintiff's treating psychiatrist, Dr. Parekh, noted in April of 2008 that Plaintiff was in sustained, full remission from her cocaine dependence – a statement that directly contradicts the ALJ's finding that Plaintiff's cocaine dependence was only in early partial remission. (R. at 443). Further, none of Plaintiff's treating sources questioned the veracity of her subjective complaints throughout her period of sobriety, and auditory hallucinations continued throughout. (R. at 442).

It is this court's opinion that for the purposes of formulating an accurate RFC assessment, the ALJ will need to discuss and more clearly articulate which of Plaintiff's limitations are not attributable to her DAA, and review all relevant, probative evidence. The ALJ must provide objective support from the record indicating that Plaintiff's DAA and other mental impairments were distinct and had distinct effects. *Ambrosini*, 727 F.Supp.2d at 430. The ALJ must also address whether Plaintiff's disabling limitations relating to DAA can reasonably be said to have ceased during Plaintiff's established time of sobriety in approximately September of 2006.

## VI.  CONCLUSION

20

Based upon the foregoing, the ALJ failed to put forth sufficient facts from the record to justify her decision. The ALJ's failure to adequately address relevant, probative evidence deprives the court of the benefit of a full explanation of the ALJ's determination. As a result, this court will not conclude that substantial evidence supported the ALJ's decision.

"On remand, the ALJ shall fully develop the record and explain [her] findings... to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization" by the ALJ. *Thomas v. Commissioner of the Social Security Administration*, 625 F.3d 798, 800 – 01 (3d Cir. 2010). *See also Ambrosini v. Astrue*, 727 F.Supp.2d 414, 432 (W.D.Pa. 2010). Testimony need not be taken, but the parties should be permitted input via submissions to the ALJ. *Id.* at 801 n. 2.

Accordingly, Plaintiff's Motion for Summary Judgment will be granted, to the extent it seeks a remand for further consideration, and denied, to the extent it seeks a reversal and entry of final judgment in favor of Plaintiff; Defendant's Motion for Summary Judgment will be denied; and, the decision of the ALJ will be vacated and the case remanded for further consideration not inconsistent with this opinion. An appropriate Order will follow.

*s/ Donetta W. Ambrose*
Donetta W. Ambrose
United States District Judge

cc/ecf: Karl E. Osterhout, Esq.
521 Cedar Way, Suite 200
Oakmont, PA 15139
(412) 794-8003

Paul Kovac, Esq.
United States Attorney's Office
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
(412) 644-3500

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEAN M. CAREY, | ) |
| | ) |
| Plaintiff | ) |
| | ) Civil Action No. 10-889 |
| v. | ) |
| | ) Judge Donetta W. Ambrose |
| COMMISIONER OF | ) |
| SOCIAL SECURITY, | ) Electronic Filing |
| | ) |
| Defendant | ) |

## ORDER OF COURT

AND NOW, this 2nd day of March, 2011, in accordance with the foregoing

Memorandum Opinion,

IT IS HEREBY ORDERED that Defendant Commissioner of Social Security's Motion

for Summary Judgment [15] is DENIED, Plaintiff Jean M. Carey's Motion for Summary

Judgment [10] is GRANTED, in part, and DENIED, in part, and the decision of the

Commissioner of Social Security is vacated and REMANDED, pursuant to the fourth sentence of

42 U.S.C. § 405(g).

*s/Donetta W. Ambrose*
Donetta W. Ambrose
United States District Judge

cc/ecf: Karl E. Osterhout, Esq.
521 Cedar Way, Suite 200
Oakmont, PA 15139
(412) 794-8003

Paul Kovac, Esq.
United States Attorney's Office
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
(412) 644-3500